The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ANCHORAGE LENDING CA LLC,

    Plaintiff,

v.

SCOTT D. BENNETT, *et al.*,

    Defendants.

NO. 24-cv-1744-BJR

**ORDER RE PARTIAL SUMMARY JUDGMENT**

## I.   INTRODUCTION

This dispute began after Scate Ventures, Inc. ("Scate") defaulted on payments for a commercial equipment lease between it and Plaintiff, Anchorage Lending CA LLC ("Anchorage"). After the default, Anchorage initiated lawsuits in other courts—a replevin action and a deficiency action against Scate, and litigation against Scate's chairman and majority owner, Gregg Bennett ("Gregg"). Anchorage then sued these Defendants in this Court, asserting various claims including fraudulent transfers and successor liability. Compl., ECF No. 1. These Defendants are two of Scate's officers, Scott D. Bennett ("Scott") and Kathryn A. Bennett ("Kate"), and alleged successor entities, Scate Labs, Inc. ("Scate Labs"), Teton Digital, LLC ("Teton"), and Trinity 1 LLC ("Trinity") (collectively, the "successor companies"). *Id.*

ORDER RE PARTIAL SUMMARY JUDGMENT

- 1

Now pending before the Court is Anchorage's motion for partial summary judgment, ECF No. 33, seeking a ruling that various transfers are voidable pursuant to the Uniform Voidable Transactions Act ("UVTA"), RCW 19.40 *et seq.*, as well as summary judgment on the successor liability claims. Also pending is Anchorage's motion for partial judgment on the pleadings, ECF No. 44, seeking to strike Defendants' second through eighth affirmative defenses. Having reviewed the materials,[1] the record of the case, and the relevant legal authorities, the Court will grant in part Plaintiff's motion for partial summary judgment, and grant in part Plaintiff's motion for partial judgment on the pleadings. The reasoning for the Court's decision follows.

## II.    BACKGROUND

Anchorage and Scate entered into a commercial equipment lease (the "Lease Agreement") on October 15, 2021, in which Anchorage agreed to lease 500 "bitcoin mining servers"[2] to Scate for a one-year period with monthly payments.[3] Compl. ¶ 41. In July 2022, Scate defaulted on the Lease Agreement. *Id.* ¶ 43. Scate refused to return the equipment, and in August 2022, Anchorage filed a replevin lawsuit in Klickitat County.[4] *Id.* ¶¶ 43-45. In early 2023, Anchorage won the right to recover the equipment, and in June 2023, Anchorage sued Scate and Gregg for a deficiency judgment[5] on the balance owed after liquidating its collateral. *Id.* ¶¶45-46. Scate stipulated to a

---

[1] Including the summary judgment motion (Mot.), ECF No.33; Defendants' response in opposition, ECF No. 38; and Plaintiff's reply, ECF No. 42; together with attached declarations and exhibits; and Plaintiff's motion for partial judgment on the pleadings (Pleadings Mot.), ECF No. 44; Defendants' response in opposition, ECF No. 48; and Plaintiff's reply, ECF No. 50.

[2] This case does not require any in-depth understanding of bitcoin or bitcoin mining. However, in brief, bitcoin is a popular cryptocurrency, i.e., a digital asset, that is created through a validation process known as "mining" using high-powered computers. *See Block Mining, Inc. v. Hosting Source, LLC*, No. C24-0319JLR, 2024 WL 3012948, at *1 (W.D. Wash. June 14, 2024) (providing a background on bitcoin).

[3] Anchorage did not require any personal guarantees for the lease. Opp'n 6-7.

[4] *Anchorage Lending CA, LLC v. Scate Ventures Inc.*, Klickitat County Superior Court Cause No. 22-2-00220-20, initiated on August 9, 2022 (the "Replevin Action").

[5] *Anchorage Lending CA, LLC v. Scate Ventures Inc.*, King County Superior Court Cause No. 23-2-10112-0-SEA, initiated on June 2, 2023 (the "Deficiency Action"). In July 2023, Anchorage dismissed Gregg from the Deficiency Action and filed suit against him in Douglas County. Compl. ¶ 47 (citing *Anchorage Lending CA, LLC v. Gregg*

ORDER RE PARTIAL SUMMARY JUDGMENT

- 2

judgment in favor of Anchorage for the full amount of the deficiency balance—$1,103,428.40 plus post-judgment interest. *Id.* ¶ 48.

According to Anchorage, beginning shortly after Scate defaulted on the Lease Agreement, Defendants Scott and Kate and non-party Gregg (collectively, "the Bennetts"), formed the successor companies. *Id.* ¶ 49. Anchorage asserts that the Bennetts spent or transferred funds from Scate to the successor companies as part of a scheme to avoid paying creditors, including Anchorage. *Id.* ¶¶ 49-53. Because Scate is insolvent, Anchorage is unable to collect on the deficiency judgment. *See id.* ¶ 101.

Anchorage initiated this action in 2024, asserting claims against Scott, Kate, and the successor companies for voidable fraudulent transfers pursuant to the UVTA (Claims 1 and 2), successor liability (Claim 3), piercing the corporate veil/alter ego (Claim 4), unjust enrichment (Claim 5), and tortious interference with contractual relations (Claim 6). Anchorage now moves for partial summary judgment under Federal Rule of Civil Procedure 56(a) on its UVTA claims and successor liability claim.

### III.  LEGAL STANDARD

"Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact" and the movant is entitled to judgment as a matter of law. *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 440 (9th Cir. 2017) (quoting *United States v. JP Morgan Chase Bank Account No. Ending 8215*, 835 F.3d 1159, 1162 (9th Cir. 2016)); Fed. R. Civ. P. 56(a). "The moving party bears the initial burden of identifying

---

*Bennett, et al.*, Douglas County Superior Court Cause No. 23-2-00221-09, initiated on July 7, 2023 (the "Douglas County Action"). At the time of briefing, the Douglas County Action against Gregg to void fraudulent transfers was ongoing. Mot. 6.

ORDER RE PARTIAL SUMMARY JUDGMENT

- 3

portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each claim." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020). "If the moving party meets this burden, the opposing party must then set out specific facts showing a genuine issue for trial to defeat the motion." *Id.* If the evidence proffered by the opposing party "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted).

## IV.  DISCUSSION

Anchorage moves for summary judgment on its claim that various transfers, including a bitcoin transfer by Scate to Scott and a series of transfers spanning from September 2021 to August 2024, are voidable pursuant to the UVTA. Mot. 15-22. Anchorage also moves for summary judgment on its successor liability claim, arguing that the successor companies are the mere continuation of Scate and should be found liable for the allegedly fraudulent transfers. *Id.* at 22-24. The Court shall address these issues in turn.

### A.    The Uniform Voidable Transactions Act

The UVTA[6] governs fraudulent transfers in Washington. The overriding purpose of the statute is "to provide relief for creditors whose collection on a debt is frustrated by the actions of a debtor to place the putatively satisfying assets beyond the reach of the creditor." *Thompson v. Hanson*, 168 Wn.2d 738, 750 (2009). Washington courts have long recognized that the UVTA

---

[6] RCW 19.40 is formerly known as the Uniform Fraudulent Transfer Act ("UFTA"). In 2017, the legislature amended the UFTA to become the UVTA. S.B. 5085, 65th Legis., Reg. Sess. (Wash. 2017); RCW 19.40.900. The UVTA applies to transfers made or obligations incurred on or after July 23, 2017, and the UFTA applies to transfers made or obligations incurred before July 23, 2017. RCW 19.40.905.

ORDER RE PARTIAL SUMMARY JUDGMENT

- 4

provides causes of action for fraudulent transfer claims under two categories: "actual fraud" and "constructive fraud." *See, e.g.*, *Sedwick v. Gwinn*, 73 Wn. App. 879, 880 (1994) (addressing claims of actual and constructive fraud under the Uniform Fraudulent Transfer Act); *Vaughn v. Cohen*, No. 3:23-CV-06142-TMC, 2024 WL 4291464, at *3 (W.D. Wash. Sept. 25, 2024) (addressing claims of actual and constructive fraud under the UVTA).

To establish a UVTA claim based on actual fraud, the creditor must establish that the debtor made the transfer "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." RCW 19.40.041(1)(a). When determining whether actual intent to defraud was present, "consideration may be given, among other factors", to the eleven factors or "badges of fraud"[7] listed at RCW 19.40.041(2):

> (a) The transfer or obligation was to an insider;
>
> (b) The debtor retained possession or control of the property transferred after the transfer;
>
> (c) The transfer or obligation was disclosed or concealed;
>
> (d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>
> (e) The transfer was of substantially all the debtor's assets;
>
> (f) The debtor absconded;
>
> (g) The debtor removed or concealed assets;
>
> (h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
>
> (i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

---

[7] Both parties make reference to the non-exclusive list of factors as "badges of fraud," citing court cases that have used the term when analyzing the existence of the factors under the UFTA.

ORDER RE PARTIAL SUMMARY JUDGMENT

- 5

> (j) The transfer occurred shortly before or shortly after a substantial debt was incurred; and
>
> (k) The debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

"Because direct evidence of fraudulent intent is rarely available, courts infer intent from the totality of the circumstances." *In re Fox Ortega Enterprises, Inc.*, 631 B.R. 425, 447 (Bankr. N.D. Cal. 2021). The list of factors at RCW 19.40.041(2) is not exhaustive, and "while the trial court *can* consider the statutory factors, it is free to consider different or additional factors." *Suess v. Nw. Timber & Dev., Inc.*, 24 Wn. App. 2d 1010, 2022 WL 14297047, at *12 (2022).

A claim of constructive fraud may be shown in two ways. First, a transfer may constitute constructive fraud with respect to claims arising *after* the transfer if the debtor made the transfer

> [w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (i) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

RCW 19.40.041(1)(b). Alternately, when a creditor's claim arises *before* the transfer, a transfer constitutes constructive fraud

> if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation"
>
> [or]
>
> if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent."

RCW 19.40.051.

ORDER RE PARTIAL SUMMARY JUDGMENT

- 6

If a creditor proves the elements of a voidable transfer based on actual or constructive fraud, the creditor may void the transfer to the extent necessary to satisfy a claim, among other remedies. RCW 19.40.071(1); *see generally* RCW 19.40.081(2). However, a transfer is not voidable "against a person that took in good faith and for a reasonably equivalent value." RCW 19.40.081(1). In Washington, creditors must prove actual fraud transfers by "clear and satisfactory proof." *In re Nw. Territorial Mint, LLC*, 591 B.R. 852, 871-72 (Bankr. W.D. Wash. 2018). The burden of proof for constructive fraudulent transfers is a preponderance of the evidence. RCW 19.40.051(3). Although the burden of proof rests upon the party seeking to set aside a fraudulent transfer, the burden shifts to the defendant to prove good faith when the consideration for the transfer is shown to be grossly inadequate. *Workman v. Bryce*, 50 Wn.2d 185, 189 (1957).

### B.    Bitcoin Transfer

According to Anchorage, on November 30, 2021, about six weeks after Scate signed the Lease Agreement, Scate transferred 3.6 Bitcoin to Scott worth $208,256.41[8] (the "Bitcoin Transfer"). Compl. ¶¶ 41, 76. Anchorage asserts that the Bitcoin Transfer is voidable under a theory of actual fraud because (1) there was no legitimate purpose for gifting Scott Bitcoin six weeks after Scate signed the Lease Agreement, (2) the transfer does not appear in Scate's payroll records or general ledger, and (3) Scate's tax returns show that Scott was not a shareholder in 2021. Mot. 2, 4-5, 19, 21. Defendants contend that at the time of the transfer, Scate was financially solvent with sufficient capital reserves, and the Bitcoin Transfer was a legitimate shareholder distribution because Scott had been a Scate shareholder since 2018. Opp'n 1, 3, 5-6, 10, 13-14, 18.

---

[8] Valuation asserted in the Complaint, but the Court notes that Anchorage uses a valuation of $208,800 in the motion brief. *Compare* Compl. ¶ 76 *with* Mot. 4.

ORDER RE PARTIAL SUMMARY JUDGMENT

- 7

The Court agrees that indicia of fraudulent intent are present. First, it is undisputed that the Bitcoin Transfer from Scate to Scott constituted an insider transfer because Scott was a family member of Scate's majority shareholder, Gregg, at the time of the transfer. *See* RCW 19.40.011(8)(a)(i) (providing that an "insider" includes individuals who are family members of a general partner of a debtor); RCW 19.40.041(2)(a); Compl. ¶ 5 (describing Gregg as the father of Scott and Kate). Second, the November 30, 2021 Bitcoin Transfer was made relatively soon after Scate incurred substantial debt in the form of the Lease Agreement executed on October 15, 2021. Compl. ¶¶ 41, 76; RCW 19.40.041(2)(j).

However, Defendants have provided balance sheets showing that, at the time of the Bitcoin Transfer in November 2021, Scate had a net operating income in excess of $650,000, as well as assets in excess of $9 million, with approximately $4.3 million in liabilities. Rosencrantz Decl. Ex. 2 at 40-41, 52, ECF No. 41-2. Additionally, it is undisputed that, at the time of the Bitcoin Transfer, Scate had yet to miss a payment to Anchorage. Opp'n at 14. Indeed, Scate's presumptive date of insolvency was not until July 1, 2022, which followed a significant decline in the market value of Bitcoin that largely occurred after November 2021. RCW 19.40.021(2) ("A debtor that is generally not paying the debtor's debts as they become due other than as a result of a bona fide dispute is presumed to be insolvent."); Mot. 17 ("Scate stipulated it was unable to pay Anchorage beginning July 1, 2022."); Rosencrantz Decl. Ex. 2 ¶¶ 29-33 (describing the value of cryptocurrencies, specifically Bitcoin, plummeting from a high of $68,000 per coin in November 2021 to below $20,000 per coin); *see also* David Gura, *2022 Was the Year that Crypto Came Crashing Down to Earth*, Nat'l Pub. Radio (Dec. 29, 2022, 5:00 AM), https://www.npr.org/2022/12/29/1145297807/crypto-crash-ftx-cryptocurrency-bitcoin (last visited May 25, 2026).

ORDER RE PARTIAL SUMMARY JUDGMENT

- 8

As to the issue of Scott's shareholder status, the parties have produced conflicting evidence. In support of its argument that Scott was not a Scate shareholder at the time of the Bitcoin Transfer, Anchorage provided a copy of Scate's 2021 tax return, which reflects that Gregg owned 100 percent of Scate shares that year. Palomares Decl. Ex. 1, FY 2021 Tax Return, ECF No. 35-1. Anchorage has also produced excerpts from Scott's September 2024 deposition. Palomares Decl. Ex. 6, Scott Dep., ECF No. 35-6. Scott testified at his deposition that "when Scate was founded [in 2018], Gregg owned 100 percent of the company." *Id.* at 224:21-22. Additionally, when presented with a copy of Scate's 2021 tax return showing that Gregg was the sole shareholder that year, Scott testified that "it must have been the next year that I got some kind of ownership." *Id.* at 225:18-19. But Defendants provided a copy of a Scate shareholder certificate dated February 8, 2018, which reflects that Scott was the stockholder of 20 shares. Scott Bennett Decl. Ex. 1, Shareholder Cert., ECF No. 40-1.

Considering all the evidence in the record before the Court, the Court finds that the Defendants produced sufficient evidence to raise a genuine issue of material fact regarding the Bitcoin Transfer. Regardless whether the transfer was made in exchange for reasonably equivalent value, Scott's shareholder status at the time of the Bitcoin Transfer is a material consideration. *Suess*, 2022 WL 14297047, at *12. Shareholder distributions are ordinary and reasonable from a profitable company with reserves. *See, e.g.*, RCW 23B.06.400 (allowing for distributions as long as the corporation remains solvent). As such, a showing that Scott was a shareholder at the time of the Bitcoin Transfer would undermine Anchorage's claim that the transfer was made with fraudulent intent.

Accordingly, because there are genuine disputes of material facts, the Court will deny summary judgment as to the Bitcoin Transfer.

ORDER RE PARTIAL SUMMARY JUDGMENT

- 9

### C.    Successor Transfers

Anchorage describes the remaining transfers in four categories: (1) the Expensify Purchases; (2) the Money Transfers; (3) the Bennett Payments; and (4) the Intangible Transfers. Mot. 2, 15. Defendants argue that the bulk of the "evidence" relied upon by Anchorage is inadmissible, and they object to Anchorage's attempt to void broad categories, containing ordinary business transactions, rather than addressing the propriety of each individual transfer. Opp'n 1-2, 8-12, 15-16.

First, the Court recognizes that the standard for admission of evidence during the summary judgment stage is lenient and that the Court may consider evidence in inadmissible form if the evidentiary objections could be cured at trial. *Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840, 846 (9th Cir. 2004). Thus, "[e]ven [ ] declarations that do contain hearsay are admissible for summary judgment purposes [if] they 'could be presented in an admissible form at trial.'" *Id.* (quoting *Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003)); *see also JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016) (noting that "at summary judgment a district court may consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony").

The Court is satisfied that Anchorage has adequately responded to Defendants' objections regarding the submitted evidence, by showing how the exhibits would be admissible at trial, adding that the exhibits were largely produced by Defendants in discovery, so they are "deemed authentic when offered by the party-opponent." Reply 5-6 (quoting *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 777 n.20 (9th Cir 2002)).

The Court shall address each category in turn and will remain mindful whether the evidence presented by Anchorage could be provided in an admissible form. The Court will rule, as needed,

ORDER RE PARTIAL SUMMARY JUDGMENT

- 10

on specific evidentiary objections that are material to its ruling. *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010).

### 1.    Expensify Purchases

Anchorage describes the Expensify Purchases as a series of purchases made by Scate on behalf of the successor companies from May 2022 to December 2023 that Scate recorded using two software management systems: Expensify and Quickbooks. Mot. 3, 9. Anchorage asserts that the Expensify Purchases are voidable under theories of actual and constructive fraud because Scate did not receive any value in exchange for the transfers, Scate was insolvent at the time the purchases were made, the transfers were made to an insider, and Defendants concealed the transfers. *Id.* at 16-20. Defendants argue that the Expensify purchases were transactions made in the ordinary course of business, such as reimbursements for expenses, payments to employees or contractors, vendor payments, and operational costs. Opp'n 10, 16.

Anchorage contends that each of the Expensify Purchases are traceable to the successor companies through Scate's Expensify account, which contains "tags" and descriptions that reference either (1) the successor companies; (2) entities associated with the successor companies; (3) travel taken on behalf of the successor companies; or (4) services provided for the successor companies, including legal services. Mot. 9-10; Compl. ¶¶ 84-86. As evidence that the Expensify Purchases were made on behalf of the successor companies, Anchorage provided detailed transactions in the form of copies of receipts and expense reports from May 2022 to December 2023. Palomares Decl. Ex. 28-B, Expensify Receipts & Reports, ECF No. 35-33. Anchorage also provided a chart that identifies each of the challenged transfers and notes the language from the receipts and expense reports that connects the transfers to the successor companies. Palomares Decl.

ORDER RE PARTIAL SUMMARY JUDGMENT

- 11

Ex. 28-A, Expensify Chart, ECF No. 35-32. Additionally, Anchorage provided audit logs from Quickbooks and Expensify showing that Kate and Scott deleted references to the successor companies for the Expensify Purchases, including evidence of multiple edits made on the same date that Anchorage sent Scate the Deficiency Notice. Palomares Decl. Ex. 34, Audit Log Excerpts, ECF No. 35-41; Exs. 33, 35, Audit Log Trail Records, ECF Nos. 40, 42.

As explained above, to establish constructive fraud pursuant to RCW 19.40.041(1)(b), Anchorage must establish that (1) Scate made the transfers without receiving a reasonably equivalent value in exchange, and (2) Scate was insolvent at that time, or became insolvent as a result of the transfer or obligation. RCW 19.40.041(1)(b). In determining whether the debtor made a transfer without receiving a reasonably equivalent value for the transfer, the Court first determines whether the debtor received *any* value in the exchange. *See In re Fruehauf Trailer Corp.,* 444 F.3d 203, 212 (3d Cir. 2006); *Shubeck v. Shubeck*, 8 Wn. App.2d 1007, 2019 WL 1285127, at *7 (2019).[9]

Anchorage contends that Scate received no value in exchange for the Expensify purchases because the purchases were made on behalf of the successor companies. The Court concludes that Anchorage has provided compelling evidence that the Expensify Purchases were made on behalf of the successor companies, and thus, Scate did not receive any value in exchange for the transfers.

Regarding Scate's insolvency, Anchorage argues that Scate was insolvent by June 5, 2022. Mot. 17. As evidence of Scate's insolvency as of June 5, 2022, Anchorage cites to a June 5, 2022 email from Scate's CFO:

---

[9] If so, the Court then determines if the value received was reasonably equivalent. *See In re Fruehauf Trailer Corp.,* 444 F.3d at 212. "'[I]n determining whether reasonably equivalent value was given, the focus is on whether the *debtor received* reasonably equivalent value from the transfer. In other words, the question is not whether [the transferee] gave reasonably equivalent value; it is whether [the transferor] received reasonably equivalent value.'" *Klein v. Roe*, 76 F.4th 1020, 1031 (10th Cir. 2023) (alterations in original) (quoting *Miller v. Wulf*, 84 F. Supp. 3d 1266, 1276 (D. Utah 2015)).

ORDER RE PARTIAL SUMMARY JUDGMENT

- 12

> Could you prepare a simple demand note to support these two loans. Even with the current diminished BTC valuation, Scate's operations are still cash flow positive. The infusion is needed to support Scate's debt obligations for past equipment purchases. The expectation is that the notes will be paid back as soon as operating cash flow permits and that the debt obligations will be refinanced to stretch out the payment stream.

Palomares Decl. Ex. 26-B, ECF No. 35-28. This email is suggestive of Scate's insolvency as of June 5, 2022. The UVTA provides that "[a] debtor is insolvent if, at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets." RCW 19.40.021(1). The Court finds that the email is insufficient to find as a matter of law that the sum of Scate's debts was greater than the sum of Scate's assets on June 5, 2022. Instead, the Court applies the presumptive insolvency date of July 1, 2022. Applying this date, the Court finds that Anchorage has established constructive fraud with respect to the Expensify Purchases that took place on or after July 1, 2022.

Four of the documented transfers were made prior to July 1, 2022: (1) May 9, 2022; (2) June 1, 2022; (3) June 3, 2022; and (4) June 20, 2022. *See* Expensify Chart. First, the Court notes that insolvency occurred shortly after these four transfers. *See* RCW 19.40.041(2)(i) ("The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.).

Additionally, considering the "badges of fraud" provided in RCW 19.40.041(2), there is sufficient evidence for the Court to find that the four pre-July Expensify purchases are voidable under a theory of actual fraud. For example, descriptions in the original Expensify reports for the pre-July 1, 2022 purchases reflect that each of the purchases were made on behalf of Scate Labs. *See* Expensify Receipts & Reports at 2, 15, 18; Expensify Chart; Audit Log Excerpts at 2, 8, ECF No. 35-40. And Anchorage provided Scott's deposition testimony, reflecting that around the time of these purchases, he was a 30 percent shareholder for both Scate and Scate Labs and Gregg was a 70 percent shareholder for both Scate and Scate Labs. Scott Dep. 225:18-19, 305:17-20. Further,

ORDER RE PARTIAL SUMMARY JUDGMENT

- 13

Defendants deleted references in Quickbooks to transfers being made on behalf of the successor companies. Defendants' conclusory assertion that the Expensify Purchases included ordinary business expenses is insufficient to raise a genuine issue of material fact or show that any of the transfers were taken "in good faith and for a reasonably equivalent value." RCW 19.40.081(1).

Accordingly, because there are no genuine disputes of material facts, the Court will grant summary judgment as to the Expensify Purchases.

### 2.    Money Transfers

According to Anchorage, from April 2023 to July 2024, Scate wired $327,750[10] to Teton and $78,000 to Scate Labs. Mot. 7. Anchorage asserts that these payments included $80,000 from Scate to Teton for retainer payments to two investment banker consultant firms: Gordian Crypto Advisors LLC ("Gordian") and Zinq Capital ("Zinq"). *Id.*; Compl. ¶ 59. Anchorage alleges that the Bennetts hired Gordian and Zinq to assist in raising capital to fund Teton and Trinity. Compl. ¶ 59.

As with the Expensify Purchases, Anchorage argues that Scate received no value in exchange for the Money Transfers. Mot. 16. Defendants confirm that Gordian and Zinq were hired to perform work for Teton and Trinity, but not Scate. Opp'n 19; Scott Bennett Decl. ¶ 16, ECF No. 40. Defendants argue that Scate loaned funds to Teton and Trinity that were used to pay Gordian and Zinq, the loans were made pursuant to written contracts, and such monies were repaid to Scate with interest. *Id.*

Regarding the "reasonably equivalent value" prong of RCW 19.40.041(1)(b), Anchorage provided evidence of monies transferred between April 28, 2023 to March 5, 2024 from Scate to Scate Labs ($78,000) and to Teton ($313,959.20) in the form of banking records, which Anchorage

---

[10] In the summary chart provided by Anchorage, the sum of transfers to Teton was $313,959.20. Palomares Decl. Ex. 36-A, Money Transfers Chart, ECF No. 35-41.

ORDER RE PARTIAL SUMMARY JUDGMENT

- 14

also summarized in a single chart. *See* Palomares Decl. Ex. 36-E, Scate Bank Acct. 7022 Statements, ECF No. 35-45; Ex. 36-F, Teton Bank Acct. 1691 Statements, ECF No. 35-46; Ex. 36-C, Scate Labs Bank Acct. 6161 Statements, ECF No. 35-43; Ex. 36-A, Money Transfers Chart, ECF No. 35-41. Anchorage also provided Scott's deposition testimony, who testified that (1) Scate Labs never had any assets or employees, and (2) Teton never had any employees and "did not get off the ground at all." Scott Dep. at 305:21-24, 342: 12-21, 321:24-25, 322:1, 9-14. These statements suggest that Scate Labs and Teton did not have anything of reasonably equivalent value to provide in consideration for the Money Transfers.

However, Defendants provided evidence that at least $30,000 of the transfers were loans made pursuant to promissory notes that were repaid with interest. Scott Bennett Decl., Promissory Notes, Exs. 3-5, ECF Nos. 40-3–40-5. Additionally, the Court observes that Anchorage's chart demonstrates that monies were also transferred from Teton and Scate Labs to Scate during the period of April 26, 2023 to July 29, 2024. Indeed, according to Anchorage's chart, Teton transferred $327,750 to Scate, and Scate Labs transferred $96,681.09 to Scate. Money Transfers Chart 2. Anchorage does not explain, but it asserts that Scate received "nothing in exchange for the Money Transfers *on the day of the transfers*." Mot. 16 (citing the Money Transfers Chart).

"'[T]he question of reasonably equivalent value is determined by the value of the consideration exchanged between the parties *at the time of the conveyance or incurrence of debt which is challenged.*'" *Kreidler v. Cascade Nat. Ins. Co.*, 179 Wn. App. 851, 864 n.5 (2014) (emphasis in original) (quoting *In re NextWave Pers. Commc'ns, Inc.*, 200 F.3d 43, 56 (2d Cir. 1999)). The UVTA provides that

> [v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed

ORDER RE PARTIAL SUMMARY JUDGMENT

- 15

> promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.

RCW 19.40.031(1).

Defendants do not contend that the money loaned to Teton was given in exchange for property nor used to satisfy an antecedent debt. *See* Opp'n 19. Rather, Defendants' contention is that consideration for certain transactions was the promise to repay loans with interest, i.e., Scate received a note receivable, which can be considered an asset of equal value. *See id.*; Promissory Notes. As to the remaining Money Transfers, Defendants do not meaningfully challenge Anchorage's argument that Scate did not receive value for the transfers.

Regarding the insolvency requirement, each of the individual Money Transfers took place after Scate's presumptive insolvency date of July 1, 2022. *See* Money Transfers Chart. Thus, RCW 19.40.041(1)(b)'s insolvency requirement is satisfied. Nevertheless, there remain outstanding questions of fact related to the exchanges of money between these companies since it appears from Anchorage's summary chart that the transfers were repaid such that Scate's assets were not diminished.

In sum, the Court is not satisfied that it can rule as a matter of law that Scate received no reasonably equivalent value for the Money Transfers. Accordingly, summary judgment is denied as to the Money Transfers.

### 3.    Bennett Payments

According to Anchorage, Scate's bank statements show 38 payments totaling $59,680.37 to pay Scott's American Express ("Amex") account from September 2021 to August 2024, and in December 2023, Kate used Scate's credit card to buy personal gifts totaling $1,555.13. Mot. 8-9

ORDER RE PARTIAL SUMMARY JUDGMENT

- 16

(citing Palomares Decl., Ex. 19 at 27; Ex. 27,[11] Ex. 28-B at 333, Ex. 36-B). Anchorage also notes that Scate's QuickBooks does not have an Amex account. *Id.* at 9 (citing Palomares Decl., Ex. 27-A, B, C).

Anchorage provided a chart listing the various payments from Scate bank accounts containing a description "American Express Name: Scott Bennett" including the date and amount of each transaction and Bates number references to the actual bank account statements. Palomares Decl. Ex. 36-B, Amex Payments Chart, ECF No. 35-42. Anchorage also provided Expensify Reports, which show Kate's purchase of three "Holiday Gifts" on December 14, 2023, and a text message script showing that Kate was in Arizona with her boyfriend's family on Dec 22, 2023. Expensify Receipts & Reports 333; Palomares Decl. Ex. 19, ECF No. 35-19.

Although Defendants' response did not specifically address these payments, in Scott and Kate's declarations, they each averred that any purchases made on the Amex card were for Scate business purposes or corporate gifts. Scott Bennett Decl. ¶ 19; Kate Bennett Decl. ¶ 5, ECF No. 39. In Defendants' Answer to the Complaint, they "deny that Scott has ever had a personal American Express card." Answer ¶ 78, ECF No. 21; Am. Answer ¶ 78, ECF No. 22. The Court observes that although Scate's QuickBooks may not show specifically an "Amex" credit card account, it does show that the credit card activity is recorded in a single expense account called Expensify Card Liability Account, which may be linked to an American Express account. *See, e.g.*, Palomares Decl. Ex. 27-A, Scate General Ledger, ECF No. 35-29.

Anchorage has not addressed the Bennett Payments with the same level of detail and attention as was addressed to the Expensify Purchases and Money Transfers. Nor did all of the

---

[11] The Court notes that the Palomares Declaration does not contain an Exhibit 27, but does have an Exhibit 27-A, 27-B, and 27-C, which are excerpts from Scate's general ledger downloaded from Scate's QuickBooks account.

ORDER RE PARTIAL SUMMARY JUDGMENT

- 17

summarized expenses occur after Scate's presumptive insolvency date. From the evidence in the record, it is not clear to the Court whether Scate had a corporate Amex card, or whether the individual expenses summarized by Anchorage were for legitimate business expenses as averred by Kate and Scott. And the Court will not assume that the "gifts" purchased were personal simply because the timing coincides with a time that Kate was visiting her boyfriend's family.

Accordingly, the Court finds that Anchorage's evidence is insufficient to support summary judgment for the Bennett Payments, and these transactions will not be voided under the UVTA without a trial to resolve the underlying factual disputes.

### 4.    Intangible Transfers

Anchorage contends that Defendants made intangible transfers of value, such as copying Scate's website to Scate Labs, hiring a marketing company to create Scate Labs' promotional materials that featured Scate employees, and transferring Scate's intellectual property to Scate Labs. Mot. 9 (citing Palomares Decl. Exs. 6, 28-B, and 30). Anchorage argues that Defendants "offered no explanation why they transferred Scate's Hashbox IP to Scate Labs or passed off Scate's financials to lure investors for the Texas Venture [on behalf of Teton and Trinity 1]." *Id.* at 20, 6. Defendants provided evidence showing that the Hashbox IP was owned by Scott, not Scate. Opp'n 4, 19 (citing Rosencrantz Decl. ¶ 9, and the Patent, Ex. 3).

Here, similar to the lack of detail and analysis provided for the Bennett Payments, Anchorage again fails to provide the Court with sufficient specific citations and analysis to support a finding that the Intangible Transfers are voidable under the UVTA as a matter of law. Therefore, the Court denies summary judgment as to the Intangible Transfers.

ORDER RE PARTIAL SUMMARY JUDGMENT

- 18

**D.     Successor Liability**

Anchorage also moves for summary judgment on its claim that the successor companies should be liable for the voidable transfers under a theory of successor liability. Anchorage asserts that successor liability is established because (1) the successor companies were the mere continuation of Scate, and (2) the transfers to the successor companies were for the fraudulent purpose of escaping liability. Mot. 22-24. Defendants argue that successor liability is applied only in narrow, exceptional cases, and the "mere continuation" doctrine is inapplicable here because the continuity facts are disputed. Opp'n 16.

The general rule in Washington is that a corporation purchasing the assets of another is not liable for the seller's debts. *Hall v. Armstrong Cork, Inc.*, 103 Wn.2d 258, 261 (1984). This rule is subject to limited exceptions, including where a purchasing corporation is a mere continuation of the seller. Under Washington state law, "mere continuation" requires (a) common identity of officers, directors, and stockholders of the two corporations; and (b) the insufficiency of consideration transferred to the predecessor for the assets transferred. *Columbia State Bank v. Invicta L. Grp. PLLC*, 199 Wn. App. 306, 320 (2017).

Here, there is evidence that Scott and Gregg formed the successor companies after Scate defaulted,[12] and each of them held identical roles and ownership as they held in Scate. *See* Am. Answer ¶¶ 2, 3, 5, 7-10, 13; Palomares Decl. Ex. 16, Teton Due Diligence, ECF No. 35-16. The successor companies used the same addresses that Scate used, which were the Bennetts' home addresses, Am. Answer ¶¶ 7-9, and Scate's key officers were identified as the successor companies' core team, Teton Due Diligence 1-2; Palomares Decl. Ex. 18, Scate Information Memorandum,

---

[12] Scate was presumptively insolvent as of July 1, 2022; Scate Labs was formed on August 20, 2022; Teton was formed on December 28, 2022; and Trinity was formed on July 2, 2023. *See* Compl. ¶¶ 7-9.

ORDER RE PARTIAL SUMMARY JUDGMENT

- 19

ECF No. 35-18; Palomares Decl. Ex. 21, ECF No. 35-21. But Defendants argue that the successor companies are not in the same business as Scate and describe the formation of the other companies as "routine entrepreneurial activity." Opp'n 4, 17 (citing Scott Bennett Decl. ¶ 15). Defendants state that Teton and Trinity are "not in the Bitcoin mining space," although they do not describe how the business interests were different or distinct. *See id.* But there is no discussion regarding whether the companies shared any customers, and it is apparent that Teton and Trinity pursued ventures in Texas, *see* Compl. ¶¶ 51-52, whereas Scate operated in Washington state. The Court observes that, based on the evidence currently before it, this is not a situation where any of the new companies is literally the old company under a new name, i.e., it is not obvious that any of the successor companies is "merely a new hat"[13] for Scate. Disputed factual questions, such as the nature of the underlying businesses and customers, are for the finders of fact to resolve.

Successor liability may also be imposed "where the transfer of assets is for the fraudulent purpose of escaping liability." *Northgate Ventures LLC v. Geoffrey H. Garrett PLLC*, 10 Wn. App. 2d 850, 863 (2019) (quoting *Eagle Pac. Ins. Co. v. Christensen Motor Yacht Corp.*, 85 Wn. App. 695, 707 (1997)). "A fraudulent transfer can be shown by (1) proving fraud or actions otherwise lacking good faith, (2) insufficient consideration received for the assets, and (3) that the predecessor was left unable to respond to creditor's claims." *Id.* Anchorage relies on its analysis of the badges of fraud related to the Successor Transfers, some of which the Court has found are voidable under the UVTA. The Court concludes, however, that there remain disputes of fact that prevent a finding that any or all of the successor companies are liable to Anchorage under a successor liability theory.

---

[13] *Cashar v. Redford,* 28 Wn. App. 394, 397 (1981) (citation omitted).

ORDER RE PARTIAL SUMMARY JUDGMENT

- 20

Accordingly, the Court will deny summary judgment on Anchorage's successor liability claim.

### E.      Defendants' Affirmative Defenses

Separately, Anchorage moves for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), seeking to dismiss seven of Defendants' eight affirmative defenses (2-8). Pleadings Mot. 1. Defendants pleaded eight affirmative defenses: (1) failure to state a claim; (2) failure to mitigate damages; (3) breach of the duty of good faith and fair dealing; (4) unclean hands; (5) violation of Federal Rules 1 and 11(b)(1); (6) violation of Federal Rule 19; (7) offset and/or setoff; and (8) reservation of right to add defenses. Am. Answer 26-27. Defendants argue that the motion is procedurally improper and untimely but agree to the dismissal of three defenses (5, 6, 8). Pleadings Opp'n 1, 12-14. They argue that the substance of Anchorage's motion is to strike affirmative defenses, which should be brought under Rule 12(f) within 21 days of the Answer being served. *Id.* at 1-2 (citing Fed. R. Civ. P. 12(f)(2)).

Federal Rule 12(f) provides that a court may strike from a pleading any "insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). However, after the 21-day window has passed, a party may raise the failure to "state a legal defense to a claim" via a Rule 12(c) motion for judgment on the pleadings. Fed. R. Civ. P. 12(h)(2)(B). Rule 12(c) provides that "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings."

A Rule 12(c) motion is reviewed under the same standard as a Rule 12(b)(6) motion to dismiss. *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989) (describing the motions as "functionally identical" except for time of filing). The court takes as true the non-moving

ORDER RE PARTIAL SUMMARY JUDGMENT

- 21

party's factual allegations and draws all reasonable inferences in that party's favor. *Hines v. Youseff*, 914 F.3d 1218, 1227 (9th Cir. 2019); *Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353, 360 (9th Cir. 2005). Judgment under Rule 12(c) "is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir. 1989). A Rule 12(c) motion may be based on either (1) the lack of a cognizable legal theory, or (2) insufficient facts to allege a cognizable claim. *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019). Judgment "may only be granted when the pleadings show that it is 'beyond doubt that the [non-moving party] can prove no set of facts in support of his claim which would entitle him to relief.'" *Enron Oil Trading & Transp. Co. v. Walbrook Ins. Co.*, 132 F.3d 526, 529 (9th Cir. 1997) (citations omitted). While Rule 12(c) does not address "partial" judgments, it is common practice to apply the rule to individual claims and defenses. *Mays v. Wal-Mart Stores, Inc.*, 354 F. Supp. 3d 1136, 1141 (C.D. Cal. 2019).

With regard to pleading affirmative defenses, in this district, courts have generally adopted a "fair notice" middle ground, requiring "at least some facts indicating the grounds on which the defense is based," but not requiring the plausibility standard.[14] *See, e.g.*, *Grande v. U.S. Bank Nat'l Ass'n*, No. C19-333 MJP, 2020 WL 2063663, at *2 (W.D. Wash. Apr. 29, 2020); *Smith v. Bank of New York Mellon*, No. C19-0538-JCC, 2019 WL 3428744, at *1 (W.D. Wash. July 30, 2019).

---

[14] The Court notes that the Ninth Circuit has not issued a definitive, binding appellate ruling on whether to apply the *Iqbal/Twombly* heightened pleading standard to affirmative defenses. *See Silver v. Cap. One, N.A.*, No. 3:25-CV-05175-DGE, 2025 WL 2830749, at *2 (W.D. Wash. Oct. 6, 2025) (referencing the pleading standard outlined in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). When it has addressed affirmative defenses post-*Iqbal/Twombly*, it has done so using the traditional "fair notice" lens without explicitly adopting or rejecting the plausibility standard. *See, e.g.*, *Kohler v. Flava Enters.*, 779 F.3d 1016, 1019 (9th Cir. 2015)("[T]he 'fair notice' required by the pleading standards only requires describing the defense in 'general terms.'" citing 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1274 (3d ed.1998)).

ORDER RE PARTIAL SUMMARY JUDGMENT

- 22

"Detailed factual allegations are not required—simply pleading enough factual content to identify the factual grounds on which an affirmative defense rests is adequate to provide fair notice of the affirmative defenses to Plaintiff and the Court." *White v. Univ. of Washington*, No. 2:22-CV-01798-TL, 2023 WL 3582395, *7 (W.D. Wash. May 22, 2023) (citation omitted; cleaned up).

Since Defendants have agreed to the dismissal of their affirmative defenses 5, 6, and 8, the Court will address only the remaining challenged defenses—2, 3, 4, and 7.

### 1.    Defense 2 – Failure to mitigate damages

Anchorage asserts that Defense 2 fails because a failure to mitigate damages defense requires a preexisting duty of contractual relationship between the parties, and it does not apply to Anchorage's claims. Pleadings Mot. 6-7. The Lease Agreement was between Anchorage and non-party Scate, whereas Defendants are third parties who allegedly received fraudulent transfers from Scate. The UVTA, however, is not a contract claim; it is a statutory remedy rooted in equity and tort law designed to protect a creditor's ability to collect a debt. Under RCW 19.40.902, standard principles of law and equity supplement the UVTA. Although the Court agrees with Defendants that the duty to mitigate, or the avoidable-consequences doctrine, is a fundamental, universal principle of equity, the Defendants pleaded no facts to support this defense. A bare-bones statement is insufficient to provide fair notice of the grounds for a failure to mitigate defense.

### 2.    Defenses 3 and 4 – Good faith and fair dealing and clean hands

Anchorage argues that the duty of good faith and fair dealing does not apply because there is no contract between it and any of the Defendants. Pleadings Mot. 9. Since Anchorage's Lease Agreement was with Scate, a non-party, Anchorage is technically correct that the implied covenant of good faith and fair dealing is a derivative doctrine that only exists to prevent a party from evading

ORDER RE PARTIAL SUMMARY JUDGMENT

- 23

the spirit of an existing contract. But Defendants argue that they are asserting equitable defenses challenging good faith in the dealings between Anchorage and Scate and the requirement for clean hands and equitable conduct. Pleadings Opp'n 11-12. Again, while the Court agrees that such a defense may be pleaded, Defendants have failed to do so. Defendants merely stated that Plaintiffs damages are precluded by its "violation of its duties of good faith and fair dealing," and "Plaintiffs claims are barred by its own unclean hands and otherwise inequitable conduct." Am. Answer 26. Defendants pleaded no facts to support these statements, so they failed to give Anchorage fair notice of the grounds for their defense.

### 3.      Defense 7 – Offset and/or setoff

Anchorage contends that setoff does not apply because Defendants cannot allege that Anchorage owes any debt to them. Pleadings Mot. 12. Defendants argue that Anchorage has also sued Gregg to receive monies subject to the UVTA based on this same debt, and their defense is to ensure there is no double recovery. Pleadings Opp'n 13. The Court agrees that should Anchorage recover from Gregg, the Defendants are entitled to an offset that prevents double recovery. Under RCW 19.40.081(3), any money judgment entered against a transferee is explicitly "subject to adjustment as the equities may require." Also, since Anchorage claims it does not seek double recovery, the Court does not find it necessary to prevent Defendants from pleading this affirmative defense.

### V.   CONCLUSION

For the foregoing reasons:

1. Plaintiff Anchorage Lending CA LLC's Motion for Partial Summary Judgment, ECF No. 33, is GRANTED IN PART and DENIED IN PART;

    a.   Summary judgment is GRANTED as to the Expensify Purchases;

ORDER RE PARTIAL SUMMARY JUDGMENT

- 24

    b.  Summary judgment is DENIED as to the Bitcoin Transfer, the Money Transfers, the Bennett Payments, and the Intangible Transfers;

    c.  Summary judgment is DENIED as to the successor liability claim.

2. Plaintiff Anchorage Lending CA LLC's Motion for Partial Judgment on the Pleadings Under Fed. R. Civ. P. 12(c), ECF No. 44, is GRANTED IN PART and DENIED IN PART;

    a.  Affirmative defenses 5, 6, and 8 are dismissed as unopposed;

    b.  Judgment is granted as to affirmative defenses 2, 3, and 4, and these affirmative defenses are dismissed without prejudice;

    c.  Judgment is denied as to affirmative defense 7, and Defendants may present this defense at trial.

3.  The Clerk is directed to reassign this case to a local judge for trial proceedings.

DATED this 28th day of May 2026.

_Barbara J. Rothstein_

Barbara Jacobs Rothstein
United States District Judge

ORDER RE PARTIAL SUMMARY JUDGMENT

- 25